## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **DANNY PATTERSON** | **CIVIL ACTION** |
| **VERSUS** | **CASE NO. 13-337** |
| **BLUE OFFSHORE BV, et al.** | **SECTION: "G"(3)** |

## ORDER AND REASONS

This litigation arises from an accident that occurred at sea off the coast of Russia. Presently pending before the Court are a "Re-Urged Motion [to] Dismiss for Lack of Personal Jurisdiction Pursuant to Rule 12(b)(2)"[1] filed by Defendant FMC Kongsberg Subsea AS ("FMC Kongsberg") and a "Motion to Dismiss"[2] filed by Defendant Aker Subsea AS ("Aker Subsea"). Having reviewed the motions, the memoranda in support, the memoranda in opposition, the record, and the applicable law, the Court will grant the pending motions.

## I. Background

### A.    *Factual Background*[3]

In his complaint, Plaintiff Danny Patterson alleges that he injured his knee and leg on August 21, 2012 while working for Blue Offshore as a Jones Act Seaman on the vessel "M/V Simon Stevin," then located off the coast of the Russian Federation.[4] Patterson, claiming negligence, alleges that Defendants Blue Offshore BV, Aker Solutions, Inc. ("Aker Solutions"), and    FMC

---

[1] Rec. Doc. 127.

[2] Rec. Doc. 97.

[3] The factual background of this case has been summarized in several of the Court's prior Orders. This summary is taken from the Court's March 3, 2015 Order denying the "Motion for Summary Judgment" filed by Defendant FMC Technologies, Inc. (Rec. Doc. 132).

[4] Rec. Doc. 1 at p. 2; Rec. Doc. 20 at p. 1.

Technologies, Inc. ("FMCTI") "jointly and severally" caused his injuries, which rendered him unfit for duty.[5] In an amended complaint, Patterson identifies FMC Eurasia, LLC ("FMC Eurasia"), FMC Kongsberg Subsea AS  ("FMC Kongsberg"), and Aker Subsea AS ("Aker Subsea") as likewise "indebted unto [him] for all damages to which he is entitled to receive[.]"[6]  Patterson alleges that FMCTI, FMC Eurasia, FMC Kongsberg, Aker Solutions, and Aker Subsea served as contractors charged with providing sub-sea umbilical equipment and/or technical supervision on the project where he sustained his injuries while working for Blue Offshore, and that each defendant is liable to him in connection with their performance of their role in the project.[7] His allegations against each party are as follows.

First, Patterson contends that FMCTI failed to: (1) "provide proper and safe umbilical equipment for the job in question;" (2) "take steps to ensure that the contracted work was performed in a safe and workmanlike manner;" (3) "take steps to remedy the improper and unsafe umbilical equipment once it was known or should have been known to it through the exercise of reasonable care;" and (4) "satisfy, and hence  breach of [sic] the terms of its contract of which [he] was a third party beneficiary."[8]

Second, Patterson asserts that Aker Solutions failed to: (1) "provide proper and safe umbilical equipment for the job in question;" (2) "take steps to remedy the improper and unsafe umbilical equipment once it was known or should have been known to it through the exercise of reasonable care;" (3) "satisfy, and hence breach of [sic] the terms of its contract of which [he] was

---

[5] Rec. Doc. 1 at 2–3, 5.

[6] Rec. Doc. 73 at pp. 1–2.

[7] Rec. Doc. 1 at pp. 3–4; Rec. Doc. 73 at pp. 1–2.

[8] Rec. Doc. 1 at p. 3.

a third party beneficiary."[9]

Third, Patterson contends that Blue Offshore failed to "provide [him] with a safe place to work and [committed] other violations of the Jones Act as will be shown at trial."[10] Fourth, Patterson contends that FMC Eurasia and Aker Subsea "failed to properly provide . . . technical supervision."[11] Fifth, Patterson asserts that FMC Kongsberg "failed to properly provide . . . equipment" for the project.[12]

**B.      *Procedural Background*[13]**

Patterson filed the present lawsuit on February 22, 2013.[14] On July 11, 2013, Patterson filed a "First Supplemental and Amended Complaint," adding allegations regarding his residence, the location of the accident, and a jury demand.[15] On May 13, 2014, Patterson filed a "First Supplemental and Amending Complaint," adding FMC Eurasia, FMC Kongsberg, and Aker Subsea as defendants.[16]

On August 26, 2014, FMC Kongsberg filed a "Motion to Dismiss for Lack of Personal

---

[9] *Id.* at pp. 3–4.

[10] *Id.* at p. 4.

[11] Rec. Doc. 73 at p. 2.

[12] *Id.* The instant motions address only whether this Court has personal jurisdiction over FMC Kongsberg and Aker Subsea.

[13] Significant motion practice has occurred in this case, and has been comprehensively summarized in prior Orders. *See* Rec. Doc. 132 at pp. 3–6. Here, the Court summarizes only the procedural history related to FMC Kongsberg and Aker Subsea.

[14] Rec. Doc. 1.

[15] Rec. Doc. 20.

[16] Rec. Doc. 73.

Jurisdiction Pursuant to Rule 12(b)(2)."[17] On September 16, 2014, Aker Subsea filed a "Motion to Dismiss."[18] On October 2, 2014, Patterson moved to continue the submission of Aker Subsea's "Motion to Dismiss" in order to allow Patterson to conduct jurisdictional discovery.[19] The Court granted that motion on October 3, 2014, re-setting the submission date of Aker Subsea's "Motion to Dismiss" to January 7, 2015.[20] On November 10, 2014, the Court denied without prejudice FMC Kongsberg's "Motion to Dismiss for Lack of Personal Jurisdiction Pursuant to Rule 12(b)(2)," permitting the parties to conduct jurisdictional discovery and granting FMC Kongsberg leave to re-urge its pending motion after January 12, 2015.[21] On February 10, 2015, FMC Kongsberg re-urged its "Motion to Dismiss for Lack of Personal Jurisdiction Pursuant to Rule 12(b)(2)."[22] On March 4, 2015, the Court heard oral argument on FMC Kongsberg's re-urged "Motion to Dismiss for Lack of Jurisdiction Pursuant to Rule 12(b)(2)."[23]

---

[17] Rec. Doc. 90. Patterson filed an opposition to the motion on September 9, 2014. Rec. Doc. 91. On September 15, 2014, with leave of Court, FMC Kongsberg filed a reply in further support of its motion. Rec. Doc. 95.

[18] Rec. Doc. 97. Patterson filed an opposition to that motion on September 23, 2014. Rec. Doc. 99. On December 30, 2014, Patterson filed a supplemental opposition to Aker Subsea's motion. Rec. Doc. 122. On January 5, 2015, with leave of Court, Aker Subsea filed a reply in further support of its motion. Rec. Doc. 125. On March 11, 2015, with leave of Court, Patterson filed a second supplemental opposition to Aker Subsea's motion. Rec. Doc. 139.

[19] Rec. Doc. 100.

[20] Rec. Doc. 101.

[21] Rec. Doc. 106.

[22] Rec. Doc. 127. Patterson filed an opposition to the motion on February 24, 2015. Rec. Doc. 129. On March 3, 2015, with leave of Court, FMC Kongsberg filed a reply in further support of the motion. Rec. Doc. 134.

[23] Rec. Doc. 135.

## II. Parties' Arguments

**A.**   ***FMC Kongsberg's "Re-Urged Motion [to] Dismiss for Lack of Personal Jurisdiction Pursuant to Rule 12(b)(2)"***[24]

**1.    Arguments in Support**

In support of its motion, FMC Kongsberg argues that the Court should dismiss Patterson's claims against it for lack of personal jurisdiction, because Patterson "is unable to point to any facts that establish that FMC Kongsberg has sufficient contacts with Louisiana or the United States necessary to support this Court's exercise of specific or general personal jurisdiction over it."[25]

FMC Kongsberg contends that the Court lacks general jurisdiction over it, because FMC Kongsberg: (1) is a Norwegian entity with its registered offices in Norway; (2) conducts "absolutely no" business in the United States; (3) "has no offices in the United States;" (4) does not maintain a registered agent for service of process here; (5) "has never been registered to do business in Louisiana or the United States;" (6) "has no bank accounts in the United States;" (7) "has never filed or paid taxes in the United States or in Louisiana;" (8) and  "does not hold board meetings in the United States and has no shareholders with registered business addresses in the United States."[26] Thus, FMC Kongsberg argues, it "does not have any type of significant, continuous, or systematic contacts in the United States."[27]

FMC Kongsberg further avers that it did not employ Patterson, did not own the vessel at issue here, "did not enter into any contracts with the United States or obtain any products from the

---

[24] Rec. Doc. 127.

[25] Rec. Doc. 127-1 at p. 2.

[26] *Id.* at pp. 3–4.

[27] *Id.* at p. 4.

United States," did not visit or contact any person in the United States in connection with the Russian project where Patterson allegedly sustained his injuries, and conducted no other act or omission in the United States in connection with the incident at issue here.[28]

### a.   General Jurisdiction

FMC Kongsberg argues that even if Patterson "could show that FMC Kongsberg did engage in some limited regular business within the United States," any "conceivable contacts" it had "would be insufficient to support this Court's exercise of general jurisdiction over FMC Kongsberg."[29] In support of this assertion, FMC Kongsberg points to statements made in a deposition by Tomas Bille, its senior legal counsel, that: (1) FMC Kongsberg's offices are located in Norway; (2) FMC Kongsberg has never been sued in the United States; and (3) FMC Kongsberg has not, "arranged for work visas to be obtained" for work in the United States on behalf of FMC Kongsberg.[30]  FMC Kongsberg maintains that "under any interpretation of the facts and allegations, FMC Kongsberg is 'in no sense at home' in Louisiana or the United States."[31]  Therefore, FMC Kongsberg argues, Patterson has "failed to establish a *prima facie* case" in support of general jurisdiction.[32]

---

[28] *Id.*

[29] *Id.*

[30] *Id.* at pp. 8–9 (citing Rec. Doc. 127-2).

[31] *Id.* FMC Kongsberg further indicates that Patterson "did not dispute that this Court lacked general jurisdiction over FMC Kongsberg" in opposing its original motion to dismiss. *Id.*  In opposition to FMC Kongsberg's original motion to dismiss, Patterson asserted that the motion was premature, and requested additional time to conduct jurisdictional discovery. *See* Rec. Doc. 91. The Court, in turn, denied the motion without prejudice and granted Patterson and FMC Kongsberg up to sixty days to conduct jurisdictional discovery. *See* Rec. Doc. 106 at p. 10. It is not clear to the Court how Patterson's opposition to the original motion is relevant to the instant re-urged motion.

[32] Rec. Doc. 127-1 at p. 9.

**b.        Specific Jurisdiction**

FMC Kongsberg further maintains that this Court lacks specific jurisdiction over it, because "there is no claimed relationship between the alleged acts and/or omissions of FMC Kongsberg set forth in plaintiff's Complaint and the State of Louisiana or the United States."[33] Rather, FMC Kongsberg argues, the events at issue here "occurred wholly outside the United States and in the territorial waters of a foreign country," and Patterson cannot allege or show that "any contract under which FMC Kongsbeg was providing equipment" onboard the vessel involved here "was negotiated, delivered, entered into, executed, or performed in Louisiana or the United States," nor any other contractual relationship between Patterson and FMC Kongsberg "related to his cause of action."[34] Thus, FMC Kongsberg contends, Patterson has failed to allege the "purposeful availment" required to establish specific jurisdiction.[35]

In support of these assertions, FMC Kongsberg points to statements made in Bille's deposition regarding the contractual structure under which FMC Kongsberg provided equipment for the project at issue here.[36]  According to FMC Kongsberg, these statements, along with an affidavit previously submitted by FMC Kongsberg,[37] show that Patterson's claim against it "relates only to alleged acts or omissions that occurred in a foreign country."[38] Further, FMC Kongsberg argues, there is "no factual nexus" between Patterson's tort claims and "any activities alleged to have [been]

---

[33] *Id.* at p. 10.

[34] *Id.*

[35] *Id.*

[36] *Id.* at pp. 10–11 (citing Rec. Doc. 127-2).

[37] Rec. Doc. 59-5.

[38] *Id.* at p. 11.

conducted by FMC Kongsberg in Louisiana or the United States," depriving the Court of any basis to exercise specific jurisdiction.[39] Additionally, FMC Kongsberg notes that Bille stated in his deposition that FMC Kongsberg "does not employ any US citizens in the United States," and that "as to the Russian project, which is the subject matter of this litigation, there were no secondment agreements in place for any FMC Kongsberg employees."[40]

### c.    Results of Jurisdictional Discovery

Finally FMC Kongsberg contends that although Mike Turner of FMCTI stated in a deposition that there were "14 secondment agreements in effect" between March 2012 and February 2013, these employees "worked and lived in Houston, Texas, not Louisiana;" and FMCTI was not involved in work with the Russian gas company at issue here.[41] In light of these statements, and in light of Bille's statements, discussed above, FMC Kongsberg argues that Patterson cannot meet his burden of showing that FMC Kongsberg purposefully availed itself of Louisiana law, or that FMC Kongsberg has "continuous and systematic contacts" with Louisiana.[42]  Indeed, FMC Kongsberg contends, Patterson "has failed to present evidence of any contacts between FMC Kongsberg and Louisiana," rendering the exercise of general jurisdiction inappropriate.[43] Further, FMC Kongsberg asserts, Patterson cannot make the requisite showing in support of specific jurisdiction, because FMC Kongsberg has presented evidence that (1) "nothing it did" related to the project at issue here "occurred in the State of Louisiana," and that (2) none of the seconded FMC Kongsberg employees

---

[39] *Id.* at pp. 11–12.

[40] *Id.* at p. 12.

[41] *Id.* at p. 13 (citing Rec. Doc. 127-5).

[42] *Id.* at p. 14.

[43] *Id.*

"worked in Louisiana . . . worked on the Russian project in question . . . [or] worked with FMC Kongsberg's ultimate customer in Russia."[44]

### 2.      Patterson's Opposition[45]

In opposition to FMC Kongsberg's motion, Patterson contends that this Court may exercise general jurisdiction over FMC Kongsberg, for several reasons.[46] First, Patterson argues, FMC Kongsberg seconded 17 employees to Texas between 2009 to 2012.[47] According to Patterson, FMC Kongsberg maintained an "employment relationship" with these seconded employees.[48]

Patterson argues that the depositions of Bille and Turner provide "further indications of the ongoing continuous contacts that FMC Kongsberg has with the United States."[49] According to Patterson, Bille stated that he "frequently" traveled to Texas to attend meetings with the "global legal team."[50] Patterson asserts that Bille also stated that the FMC "subsea" entities all perform "essentially the same type of work," subsea work, distinguishing the present case from a situation in which a large multinational corporation "has different product lines manufactured from entirely

---

[44] *Id.*

[45] Rec. Doc. 129.

[46] *Id.* at p. 3.

[47] *Id.* pp. 3–4.

[48] *Id.* at pp. 4–7. Specifically, Patterson avers that FMC Kongsberg's secondment agreements: (1) provide that seconded employees retain certain benefits; (2) forbid seconded employees from violating its code of conduct or engaging in activities that may "conflict" with their service to FMC Kongsberg; (3) reserve to FMC Kongsberg the right to reassign seconded employees during their term of secondment; (4) are governed by "home country" law, rather than "host country" law; (5) keep all employees on the "home country" payroll; and (6) hold FMC Kongsberg and secondment candidates "mutual [sic] responsible" for initiating the required visa or work permit application process. *Id.*

[49] *Id.* at p. 7.

[50] *Id.* at pp. 7–8.

separate and distinct entities across the globe,"[51] or from a scenario in which "individuals from Norway are being temporarily trained in the United States on specialized technology that is controlled out of Houston."[52] Patterson further indicates that Turner stated in his deposition that he had been seconded from FMCTI to FMC Kongsberg from 2010 to 2014, and "made clear" at that time that FMCTI also seconds employees from its office in Houston to FMC Kongsberg.[53]

Patterson contends that although "case law has rejected the theory of general jurisdiction based upon a few employees working in a state,"[54] the present case is different, because FMC Kongsberg maintains a "specific 'system'" of secondment agreements.[55] Additionally, Patterson argues, it is "uncontested that [FMC] Kongsberg anticipates" making further secondments "on an ongoing . . . basis" in the future.[56] Patterson further maintains that the number of FMC Kongsberg employees stationed in the United States distinguishes the present case from others.[57] For the foregoing reasons, Patterson contends, "FMC Kongsberg is all but operating out of Houston."[58]

Patterson argues that although this issue may be a novel one, the requisite "continuous and systematic connections" with the United States are present here, because FMC Kongsberg's practice of forming secondment agreements "clearly evidences" its "intention . . . to move its employees

---

[51] *Id.* at p. 8.

[52] *Id.* at p. 9 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984)).

[53] *Id.* at p. 8.

[54] *Id.* at pp. 8–9 (citing *Ratliff v. Cooper Labs, Inc.*, 444 F.2d 745, 746–48 (4th Cir. 1971)).

[55] *Id.* at p. 9.

[56] *Id.*

[57] *Id.*

[58] *Id.*

back and forth" between Norway and the United States, and sets this case apart from those involving the "potentially fortuitous occurrence of a few workers in a jurisdiction."[59]

   **3.      FMC Kongsberg's Reply**[60]

   In further support of the instant motion, FMC Kongsberg argues that Patterson has failed to demonstrate that it has "any contacts with the State of Louisiana, much less the . . . continuous and systematic contacts necessary to support the exercise of general jurisdiction."[61] FMC Kongsberg also contends that Patterson asserts a broader interpretation of Federal Rule of Civil Procedure 4(k)(2) "than this Court has accepted," by arguing that this Court may exercise personal jurisdiction over it based solely on its ties to the United States a whole.[62] According to FMC Kongsberg, personal jurisdiction is only appropriate under Rule 4(k)(2) if a defendant has the requisite minimum contacts with the forum state.[63]  Here, FMC Kongsberg maintains, these contacts are lacking.[64]

   In the alternative, FMC Kongsberg argues that even if personal jurisdiction could be founded upon a defendant's contacts with the United States, the secondment agreements at issue here do not support the exercise of general jurisdiction.[65] According to FMC Kongsberg, Patterson's claim that the entity is "all but operating out of Houston" is overstated, because FMC Kongsberg employs over 4600 people in Norway, but has only entered into secondment agreements with 14 of its

---

[59] *Id.* at p. 10 n. 10.

[60] Rec. Doc. 134.

[61] *Id.* at p. 2.

[62] *Id.* at pp. 3–4.

[63] *Id.* at p. 3.

[64] *Id.* at pp. 3–4.

[65] *Id.* at p. 4.

employees.[66] FMC Kongsberg further argues that Patterson fails to acknowledge provisions in the secondment agreements and statements in Bille's and Turner's depositions "that demonstrate that the costs associated with payroll and expenses" of the seconded employees "were paid by [FMCTI]."[67] The secondment agreements, FMC Kongsberg contends, also state that FMCTI was responsible for seconded employees' schedules, work assignments, and supervision.[68]

FMC Kongsberg asserts that no legal authority supports the exercise of general jurisdiction because: (1) "an employee of a foreign corporation travels to the United States;" or because (2) a "foreign company divides its product [or] services" in a certain way, or because (3) FMC Kongsberg "has established a policy or procedure for orderly secondment of employees to work on other projects where they may be needed."[69] Additionally, FMC Kongsberg maintains, "no case has held [that] a foreign corporation is subject to general jurisdiction in Louisiana because there is an affiliate company located in Houston."[70]  Finally, FMC Kongsberg contends that although the secondment agreements at issue here are "possibly sufficient to constitute a presence in Houston," that presence is  "minimal," "sporadic" at best, "and of small consequence," and does not rise to the level of "continuous contacts necessary for the exercise of general jurisdiction."[71] Thus, FMC Kongsberg argues, "this Court has no authority to assume jurisdiction over FMC Kongsberg," even under

---

[66] *Id.* at pp. 4–5.

[67] *Id.* at p. 5.

[68] *Id.*

[69] *Id.* at pp. 5–6.

[70] *Id.*

[71] *Id.* at p. 6.

Patterson's "expanded interpretation" of Rule 4(k)(2).[72]

**B.      *Aker Subsea's "Motion to Dismiss"*[73]**

    **1.      Arguments in Support**

In support of its motion to dismiss, Aker Subsea maintains that "the actions giving rise to this lawsuit . . . did not occur in the state of Louisiana or the United States," preventing the Court from exercising specific jurisdiction over it.[74] Aker Subsea further argues that it "does not have systematic and continuous contacts with the Eastern District of Louisiana," and is therefore not subject to general jurisdiction in this forum.[75]

    **a.      Specific Jurisdiction**

Aker Subsea first contends that this Court lacks specific jurisdiction over it, because its "alleged involvement in the events giving rise to the accident" at issue here "have no connection to this jurisdiction."[76] Specifically, Aker Subsea argues that the accident giving rise to this lawsuit occurred in the territorial waters of a foreign country, and any alleged failure on its part to properly provide technical supervision of the project did not take place in Louisiana or have "any connection to Louisiana."[77] Further, Aker Subsea  asserts, the events giving rise to this litigation "did not arise from a contact between Aker Subsea and this forum," because Aker Subsea lacks "any contacts"

---

[72] *Id.*

[73] Rec. Doc. 97.

[74] Rec. Doc. 97-1 at p. 1.

[75] *Id.*

[76] *Id.* at p. 7.

[77] *Id.*

with Louisiana.[78] Additionally, Aker Subsea avers, Patterson has "not shown that any contract entered into by Aker Subsea was negotiated, delivered, executed, or performed" in Louisiana.[79] Thus, Aker Subsea contends, it lacks the requisite "minimum contacts" with Louisiana, and has not invoked the protections and benefits of Louisiana, such that "it should reasonably anticipate being haled into court" here.[80] Finally, Aker Subsea argues that "it would be easy to demonstrate that the exercise of personal jurisdiction over Aker Subsea would be unfair."[81]

### b. General Jurisdiction

Aker Subsea next argues that Patterson's allegation that it "does business in the jurisdiction" is "vague and overgeneralized," and should be rejected as a basis for general jurisdiction.[82] According to Aker Subsea, it:

> [1] [D]oes not maintain an agent for receipt of service of process in Louisiana . . . [2] does not have any directors, officers, agents, or representatives located in Louisiana . . . [3] does not have any facilities or offices in Louisiana . . . [4] owns no property in Louisiana . . . [5] does not have any bank accounts in the United States or Louisiana . . . [6] has not filed a tax return in Louisiana nor has it paid Louisiana state taxes . . . [7] has never held any board meetings in the state of Louisiana . . . [8] does not have any shareholders with registered addresses in the state of Louisiana . . . [9] has never entered into any contracts, service agreements, purchase orders or any other agreements for the purpose of selling, promoting, advertising, or supplying any product or service within the state of Louisiana . . . [10] does not send representatives to the state of Louisiana for the service or repair of its products . . . [11] does not share employees with any Aker affiliated companies in the state of Louisiana . . . [12] has never consented to personal jurisdiction in Louisiana . . . [and ] [13] does not sell products in Louisiana and has never sold products over the

---

[78] *Id.* at pp. 7–8.

[79] *Id.* at p. 8.

[80] *Id.*

[81] *Id.*

[82] *Id.* at p. 9.

internet to customers in the state of Louisiana.[83]

Therefore, Aker Subsea maintains, it lacks continuous and systematic contacts with Louisiana.[84] Aker Subsea further argues that its contacts with Louisiana "fall far short of purposeful availment,"[85] and the exercise of personal jurisdiction over it "would offend the traditional notions of fair play and substantial justice.[86] Further, Aker Subsea contends, Patterson's "unsubstantiated and conclusory allegation that Aker Subsea does business within this jurisdiction" is "refuted by the evidence," and Patterson has failed to carry his burden of establishing that this court may properly exercise personal jurisdiction over it.[87]

### 2.      Patterson's Opposition[88]

In opposition, Patterson requests additional time for discovery.[89] Patterson also contends that although Aker Subsea contests personal jurisdiction based on its contacts with Louisiana, Federal Rule of Civil Procedure 4(k)(2) may support the exercise of personal jurisdiction based upon its contacts with the United States as a whole.[90] Patterson avers that Aker Subsea's participation in "secondment agreements," in which employees are sent to work in the United States or perform

---

[83] *Id.* at pp. 9–10 (citing Rec. Doc. 97-2 at pp. 1–3).

[84] *Id.* at p. 10.

[85] *Id.*

[86] *Id.*

[87] *Id.*

[88] Rec. Doc. 99.

[89] *Id.* at p. 1. Patterson filed an *ex parte* motion to continue submission of the instant motion in order to allow jurisdictional discovery to be conducted. Rec. Doc. 100. In that motion, he represented that counsel for Aker Subsea "agreed to allow [him] 90 days" to conduct jurisdictional discovery. Rec. Doc. 100-1 at p. 1. The Court continued hearing on the motion to January 7, 2015. Rec. Doc. 101.

[90] Rec. Doc. 99 at pp. 1–2.

work on behalf of a United States entity, "may provide a basis for jurisdiction."[91]

### 3.    Patterson's Supplemental Opposition[92]

In further opposition to Aker Subsea's motion,[93] Patterson avers that "additional discovery and information is needed before the issue of personal jurisdiction can be determined."[94] Patterson contends that jurisdictional discovery "produced a single [s]econdment [a]greement in response to a request for complete copies of all [s]econdment [a]greements between any and all Aker Subsea AS employees and any other party for a six year period."[95] According to Patterson, Mr. Even Funnemark, an Aker Subsea employee responsible for approving secondment agreements, stated in a deposition that the secondment agreement initially produced "was not a single isolated agreement," and that Aker Subsea "regularly sent its employees to the United States to work under [s]econdment [a]greements," which is not disputed by Aker Subsea.[96]

Patterson contends that employees sent to work in the United States in this manner "retained their employment status" with Aker Subsea while working in the United States.[97] Thus, Patterson contends, he anticipates that "multiple other Secondment Agreements are forthcoming."[98] Patterson

---

[91] *Id.* at p. 2.

[92] Rec. Doc. 122.

[93] Patterson filed this opposition on December 30, 2014, slightly less than three months after the Court continued hearing of the instant motion on October 3, 2014.

[94] Rec. Doc. 122 at p. 1.

[95] *Id.* at p. 2.

[96] *Id.* (citing Rec. Doc. 122-1 at p. 5).

[97] *Id.*

[98] *Id.*

further avers that he wants to depose individuals employed in the Houston office of an "Aker entity," because Funnemark mentioned that these individuals were involved in the secondment agreements.[99] Patterson argues that Funnemark's testimony regarding "the expansiveness of the [s]econdment [a]greements" and the agreement produced by Aker Subsea "should constitute a *prima facie* showing that Aker Subsea AS is subject to personal jurisdiction in the United States," because employees sent to work in the United States "remain Aker Subsea AS employees," indicating Aker Subsea's "purposeful," "systematic," and non-fortuitous contacts with the United States.[100]

Alternatively, Patterson contends, the instant motion should be denied as premature pending further discovery into the nature of Aker Subsea's secondment agreements.[101] On this point, Patterson points to a case in which a district court in this district denied a Rule 12(b)(2) motion as premature, pending discovery related to a company's involvement in the activities of its subsidiaries and "other factual questions relevant to the personal jurisdiction issues in that case."[102] However, Patterson argues, no other federal cases exist addressing whether "multiple secondment agreements may establish personal jurisdiction."[103] Thus, Patterson contends, "[a]s this appears to be an issue of first impression," further discovery should be permitted if the requisite *prima facie* showing has not been made.[104]

---

[99] *Id.* at p. 3.

[100] *Id.* at pp. 3–4.

[101] *Id.* at p. 4.

[102] *Id.* (citing *Lotherington v. Sedgwick Group, PLC*, No. 96-2316, 1996 WL 655797 (E.D. La. Nov. 7. 1996) (McNamara, J.)).

[103] *Id.*

[104] *Id.*

4.      **Aker Subsea's Reply**[105]

a.      **General Jurisdiction**

In further support of its motion, Aker Subsea contends that its secondment agreements create "few and tenuous connections with the United States," and "no contact with the State of Louisiana or the Eastern District of Louisiana."[106] Aker contends that it is "undisputed that no specific jurisdiction exists arising from the facts of this case," and that its reply is therefore "limited to general personal jurisdiction arguments."[107] According to Aker Subsea, Patterson "has no evidence of any kind that [it] has contacts with this forum," warranting dismissal of Patterson's claims against it.[108]

Aker Subsea argues that it has sent only eleven employees to the Houston, Texas office of Aker Solutions between 2011 and 2014, "which is insufficient to maintain personal jurisdiction."[109] According to Aker Subsea, it sent seconded employees to its United States affiliate, Aker Solutions, and maintained the employee's benefits, while the host company "would ultimately absorb any costs of the secondment and be responsible for the day to day direction and control of the employee," as well as the employee's local costs.[110] Therefore, Aker Subsea argues, its "only participation in the secondment arrangement is to maintain, in Norway, the seconded employee's benefits."[111] Aker

---

[105] Rec. Doc. 125.

[106] *Id.* at pp. 1–2.

[107] *Id.* at p. 2.

[108] *Id.*

[109] *Id.*

[110] *Id.* at pp. 2–3.

[111] *Id.* at p. 3.

Subsea contends that its secondments are merely "attenuated and sporadic" contacts, and that it has not "availed itself of the privilege of undertaking activities in the United States" or the "benefits thereof" by "maintain[ing] benefits" in Norway for seconded employees.[112] According to Aker, "[t]here is no legal basis or precedent for exercising general jurisdiction over a foreign corporation due to the mere existence of a secondment agreement" such as those at issue here.[113]

Aker Subsea further maintains that the act of seconding employees to Texas "should not give rise to the expectation that [it] should get haled into court in Louisiana for an incident occurring off the coast of Russia for which the seconded employees played no role."[114] According to Aker Subsea, it has not sought the benefit of any Louisiana law, because it "conducted no activities in Louisiana."[115] Indeed, Aker Subsea argues, Mr. Funnemark "confirmed that no Aker Subsea employees were sent to any location other than Houston, Texas."[116] Therefore, Aker Subsea argues, although it denies having sufficient contacts with the United States to warrant the exercise of personal jurisdiction in any court, federal jurisdiction is "possibly" proper, if at all, only in Texas.[117]

### b.    Jurisdictional Discovery

Aker Subsea also argues that additional discovery is not necessary, because it has produced to Patterson all eleven secondment agreements formed between January 1, 2011 and January 1,

---

[112] *Id.*

[113] *Id.*

[114] *Id.* at p. 4.

[115] *Id.*

[116] *Id.* (citing Rec. Doc. 125-4 at p. 31).

[117] *Id.* at p. 5.

2014, and arranged for the deposition of Mr. Funnemark during the discovery period.[118]

### 5.    Patterson's Second Supplemental Opposition[119]

In further opposition to the instant motion, Patterson notes that the jurisdictional questions at issue here are "identical" to those at issue in FMC Kongsberg's "Re-Urged Motion to Dismiss for Lack of Personal Jurisdiction Pursuant to Rule 12(b)(2)."[120] Patterson further represents that he received additional secondment agreements from Aker Subsea on January 2, 2015, after deposing a "representative" of Aker, and that he now seeks to add these agreements to the record.[121] Patterson argues that he has now made the requisite *prima facie* showing of jurisdiction, and further maintains that Aker Subsea "cannot systematically and continuously send its foreign workers into the United States to work for years at a time and yet claim lack of jurisdiction in this matter."[122] According to Patterson, the exercise of jurisdiction here, premised upon Aker Subsea's contacts with the United States as a whole, "does not offend the notions of fair play and due process."[123]

## III. Law and Analysis

### A.    *Legal Standard*

FMC Kongsberg and Aker Subsea urge the Court to dismiss Patterson's claims against them for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). When

---

[118] *Id.* Finally, Aker Subsea contends that Patterson's cited case on this point, *Lotherington v. Sedgwick Group, PLC* is inapposite, because that case addressed a question of whether a parent company's subsidiary was an *alter ego* of the parent company, which is not at issue here. *Id.* at p. 6 (citing No. 96-2316, 1996 WL 655797 (E.D. La. Nov. 7, 1996) (McNamara, J.)).

[119] Rec. Doc. 139.

[120] *Id.* at p. 1 (citing Rec. Doc. 129, Patterson's opposition to Rec. Doc. 127).

[121] *Id.* at pp. 1–2.

[122] *Id.* at p. 2.

[123] *Id.*

opposing a motion to dismiss pursuant to Rule 12(b)(2), "[t]he plaintiff bears the burden of establishing jurisdiction, but need only present *prima facie* evidence."[124] In deciding the motion, the Court may consider "affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery."[125] In this inquiry, the Court accepts as true the plaintiff's uncontroverted allegations, and resolves in the plaintiff's favor "all conflicts between the facts contained in the parties' affidavits and other documentation."[126]

Here, Patterson contends that this Court may properly exercise personal jurisdiction over both FMC Kongsberg and Aker Subsea pursuant to Federal Rule of Civil Procedure 4(k)(2). That rule provides:

> (2)   Federal Claim Outside State-Court Jurisdiction. For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if:
>
> > (A)   the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and
> >
> > (B)   exercising jurisdiction is consistent with the United States Constitution and laws.

As this Court has previously noted,[127] jurisdiction pursuant to Rule 4(k)(2) is proper where: (1) the claims against the defendant arise under federal law; (2) the defendant "does not concede to jurisdiction in another state;" and (3) "the defendant has sufficient ties to the United States as a

---

[124] *Revell v. Lidov*, 317 F.3d 467, 469 (5th Cir. 2002) (citations omitted).

[125] *Id.*

[126] *Id.*

[127] Rec. Doc. 98 at p. 17.

21

whole to satisfy due process concerns."[128]

The sole issue in dispute here concerns the third prong of the Rule 4(k)(2) analysis: whether FMC Kongsberg and Aker Subsea have sufficient ties to the United States to satisfy due process. On this point, Fifth Circuit precedent instructs that Federal Rule of Civil Procedure 4(k)(2) "draws its authority directly from federal law," and the due process to which parties are entitled under the Rule "is measured with reference to the Fifth Amendment, rather than the Fourteenth Amendment."[129] Therefore, when applying Rule 4(k)(2), the Fifth Circuit has regularly adhered to the same legal standards developed in the Fourteenth Amendment context—the "now-familiar minimum contacts analysis"[130]—but with one significant distinction, noted in a prior Order in this case.[131] Namely, where Rule 4(k)(2), and thus Fifth Amendment due process, is at issue, the Fifth Circuit looks to the sufficiency of a party's ties with the United States as a whole, rather than to the

---

[128] *Adams v. Unione Mediterranea di Sicurta*, 364 F.3d 646, 651 (5th Cir. 2004). *See also World Tanker Carriers Corp. v. MV Ya Mawlaya*, 99 F.3d 717, 721 (5th Cir.1996) (holding that Federal Rule of Civil Procedure 4(k)(2) permits courts to exercise jurisdiction in cases where a defendant has "insufficient contacts with any single state" to support jurisdiction under state long-arm statutes, but has "sufficient contacts with the United States as a whole to satisfy due process concerns.").

[129] *Submersible Systems, Inc. v. Perforadora Central, S.A. de C.V.*, 249 F.3d 413, 420 (5th Cir. 2001). *See also* Rec. Doc. 98 at p. 17.

[130] *Quick Technologies, Inc. v. Sage Group PLC*, 313 F.3d 338, 344 (5th Cir.2002) (finding contacts insufficient to support specific jurisdiction). *See, e.g., Adams*, 364 F.3d at 651 (finding "continuous and systematic" contacts); *Submersible Systems*, 249 F.3d at 420 (finding a lack of "continuous and systematic" contacts)*; System Pipe & Supply, Inc. v. M/V Viktor Kurnatovskiy*, 242 F.3d 322, 325 (5th Cir.2001) (noting that alleged contacts, if proven, would support general jurisdiction)*; World Tanker Carriers*, 99 F.3d at 723 (noting that the minimum contacts analysis applies). *See also Nabulsi v. Bin Zayed al Nahyan*, 383 Fed. App'x 380 (5th Cir.2010) (affirming dismissal predicated, in part, upon lack of general jurisdiction pursuant to Rule 4(k)(2)); *De Leon v. Shih Wei Nav. Co., Ltd.*, 269 Fed. App'x 487, 489–90 (5th Cir.2008) (finding insufficient contacts to support general jurisdiction); *Stutzman v. Rainbow Yacht Adventures Ltd.*, 265 Fed. App'x 402, 403-4 (5th Cir. 2008) (reaching the same conclusion, and finding plaintiff's assertion of error based upon the district court's reliance on specific jurisdiction "unavailing," because the general jurisdiction analysis is "more demanding" than the specific jurisdiction analysis); *R & B Falcon Drilling (Intern. & Deepwater), Inc. v. Noble Denton Group*, 91 Fed. App'x 317, 321 (5th Cir.2004) (finding insufficient contacts to support personal jurisdiction pursuant to Rule 4(k)(2)).

[131] *See* Rec. Doc. 98 at pp. 19–20.

sufficiency of its ties with any individual state, in order to determine whether the requisite showing of minimum contacts has been made.[132]  The parties dispute whether Rule 4(k)(2) requires contacts with a specific state, but the Court's prior order addressing this point acknowledged—and applied—binding Fifth Circuit authority holding that the applicable inquiry looks to a defendant's contacts with the United States as a whole, rather than with any state.[133]

Under this framework, the Court may exercise personal jurisdiction over a nonresident defendant when: (1) the defendant has purposefully availed himself of the benefits and protections of the forum (here, the United States); and (2) the exercise of jurisdiction over the defendant does not offend "traditional notions of fair play and substantial justice."[134]  Minimum contacts may be established "either through contacts sufficient to assert specific jurisdiction, or contacts sufficient to assert general jurisdiction."[135]

**B.**     *Analysis*

**1.     Personal Jurisdiction**

Although FMC Kongsberg's initial motion papers addressed both specific and general jurisdiction, Patterson subsequently conceded that he cannot make a showing of specific jurisdiction

---

[132] *See, e.g., Submersible Systems*, 249 F.3d at 420 ("The due process required in federal cases governed by Rule 4(k)(2) is measured with reference to the Fifth Amendment, rather than the Fourteenth Amendment. That is, Rule 4(k)(2) requires us to consider Central's contacts with the United States as a whole, and not just Central's contacts with the state of Mississippi.").

[133] Rec. Doc. 98 at pp. 16–20 (setting forth the applicable standards); *Id.* at p. 34 ("Patterson has met his burden of making a *prima facie* showing that his claims arise from Blue Offshore's alleged contacts with the United States.").

[134] *Central Freight Lines v. APA Transport Corp.*, 322 F.3d 376, 381 (5th Cir. 2003) (internal citations and quotation marks omitted).

[135] *Id.* (citations omitted).

as to FMC Kongsberg.[136]   Therefore, as far as FMC Kongsberg is concerned, only general jurisdiction remains disputed here.

Aker Subsea's original motion also addressed both specific and general jurisdiction.[137] In opposition to that motion, Patterson argues that the issues in dispute on this motion are "identical" to those in dispute on the "Re-Urged Motion to Dismiss Pursuant to Rule 12(b)(2),"[138] filed by Defendant FMC Kongsberg, and on this basis "refers" the Court to his briefing on that motion.[139] In that briefing, as just noted, Patterson represents that he asserts "general jurisdiction as opposed to specific jurisdiction" against FMC Kongsberg.[140] Likewise, Patterson contends as to Aker Subsea that personal jurisdiction is appropriate due to Aker Subsea's "continuous and systematic process" of sending employees to work in the United States pursuant to secondment agreements.[141] Thus, it appears that Patterson invokes only general jurisdiction against Aker Subsea. Nonetheless, Patterson has not expressly represented that he invokes only general jurisdiction. Accordingly, the Court will address both specific and general jurisdiction over Aker Subsea.

### a.    General Jurisdiction

General jurisdiction is appropriate when an entity's ties to the forum are "so continuous and

---

[136] *See* Rec. Doc. 129 at p. 3 n.3 ("In this matter, as against FMC Kongsberg, Patterson is asserting general jurisdiction as opposed to specific jurisdiction. It does not appear [that] any actions relating specifically to the Russian project took place in the United States, thus the basis for jurisdiction is general as against FMC Kongsberg, and the facts support such.").

[137] Rec. Doc. 97-1 at pp. 6–10.

[138] Rec. Doc. 127.

[139] Rec. Doc. 139 at p. 1 (citing Rec. Doc. 129).

[140] Rec. Doc. 129 at p. 3.

[141] Rec. Doc. 139 at p. 2; Rec. Doc. 129 at p. 9.

systematic" that the entity is rendered "essentially at home" in the forum.[142] In this inquiry, the defendant's contacts must be considered "*in toto*," rather than in isolation.[143] If the requisite showing of general jurisdiction has been made, this Court may exercise jurisdiction over "any action brought against the defendant,"[144] even if the action does not arise out of the defendant's forum-related contacts.[145]

Where general jurisdiction is invoked, the Court's inquiry is "broader and more demanding" than the specific jurisdiction inquiry,[146] and the Supreme Court has found a sufficient basis for general jurisdiction in only one case decided since the advent of modern personal jurisdiction doctrine.[147] In that case, *Perkins v. Benguet Consol. Mining Co.*, the Supreme Court held that the defendant, a Philippine corporation, could be held subject to personal jurisdiction in Ohio based upon its extensive business activities in Ohio during World War II.[148] Specifically, an individual identified as the defendant's president, general manager, and principal stockholder: (1) maintained an office in Ohio; (2) kept the company's office files in Ohio; (3) conducted correspondence from Ohio regarding the company's business and employees; (4) paid himself and two secretaries in Ohio; (5) maintained active company bank accounts in Ohio; (6) used an Ohio bank as a transfer agent for

---

[142] *Daimler AG v. Bauman*, 134 S.Ct. 746, 755 (2014) (citations omitted).

[143] *Holt Oil & Gas Corp. v. Harvey*, 801 F.2d 773, 780 (5th Cir. 1996).

[144] *Jackson v. Tanfoglio Giuseppe, S.R.L.*, 615 F.3d 579, 584 (5th Cir. 2010) (citations omitted).

[145] *Daimler*, 134 S.Ct. at 754 (citations omitted).

[146] *Gardemal v. Westin Hotel Co.*, 186 F.3d 588, 595 (5th Cir. 1999) (citations omitted).

[147] *See Pervasive Software, Inc. v. Lexware GmbH & Co. KG*, 688 F.3d 214, 230 (2012) (making this observation).

[148] 342 U.S. 437, 447–48 (1952).

25

company stock; (7) held several directors' meetings in Ohio; (8) managed company policies regarding the rehabilitation of the company's Philippine properties from Ohio; and (9) transferred funds from Ohio to pay for projects in the Philippines.[149]

Citing *Perkins* as an exemplary case of general jurisdiction, the Supreme Court has emphasized that a defendant's forum-related contacts must cross a high threshold to warrant the exercise of general jurisdiction.[150] Thus, in *Helicopteros Nacionales de Colombia, S.A. v. Hall*, the Supreme Court concluded that the defendant could not be held subject to general jurisdiction in Texas on the basis that it: (1) sent its Chief Executive Officer to Texas for a contract-negotiation session; (2) accepted checks drawn on a Texas bank; (3) purchased helicopters, equipment, and training from a Texas corporation; and (4) sent personnel to Texas for training.[151]

The Fifth Circuit has "consistently imposed the high standard set by the Supreme Court when ruling on general jurisdiction issues."[152] In *Johnston v. Multidata Systems Intern. Corp.*, for example, the Fifth Circuit found that general jurisdiction could not be sustained as to three defendants.[153] The first defendant sold goods and related service contracts to ten customers in the forum and advertised in trade journals reaching the forum, while its employees "periodically" attended trade shows there.[154] The second defendant purchased goods from the forum, entered into a contract with a

---

[149] *Id.*

[150] *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414–19 (1984).

[151] *Id.*

[152] *Johnston v. Multidata Sys. Intern. Corp.*, 523 F.3d 602, 611 (5th Cir. 2008).

[153] 523 F.3d at 610–615.

[154] *Id.* at 611.

corporation in the forum, employed two residents of the forum.[155] Additionally, a former director of the second defendant lived in the forum.[156]

The third defendant in *Johnston* had more extensive contacts with the forum. Specifically, it sold products and services to forum customers, was engaged in clinical trial work involving forum-law contracts (including work on behalf of forum companies), and coordinated work carried out by individuals in the forum.[157] This defendant also sent employees to the forum to service equipment, allegedly employed a permanent resident of the forum, and maintained a license to perform certain services in Texas.[158] Although the total amount of money involved in the third defendant's clinical trial work was unclear, the Fifth Circuit noted that it received "less than one percent of its testing revenue from Texas customers," and emphasized that "less than ten percent of its contracts with independent testing facilities are with doctors located in Texas." Its sales of goods to the forum, on the other hand, accounted for between 0.5% and 2.5% of its global sales during the time period considered.[159] Nonetheless, the Fifth Circuit held, these contacts, although "more substantial" than the other two defendants' contacts, "fail[ed] to create general jurisdiction."[160]

Along similar lines, in *Central Freight Lines Inc. v. APA Transport Corp.*, the Fifth Circuit held that general jurisdiction could not be sustained where the defendant "had federal operating authority" in the forum, routinely arranged shipments to and from the forum, regularly sent

---

[155] *Id.*

[156] *Id.*

[157] *Id.* at 613.

[158] *Id.*

[159] *Id.*

[160] *Id.*

27

salespeople to the forum "to develop business, negotiate contracts, and service national accounts," but was not registered to so do business there, had never maintained an office there, and had never paid franchise taxes there.[161]

In the rare cases in which the Fifth Circuit has indicated that the requisite showing of general jurisdiction over a corporation has been, or could be made, the defendants' contacts with the forum were extensive. In *Adams v. Unione Mediterranea di Sicurta*, for example, the Fifth Circuit, applying the *prima facie* standard, had "no difficulty" determining that an Italian insurer had "continuous and systematic contacts with the United States as a whole," thereby supporting jurisdiction pursuant to Rule 4(k)(2).[162] There, the record showed that the insurer paid claims to "numerous" U.S. companies, provided coverage to "numerous" other U.S. companies, insured hundreds of shipments to the United States, and "used and paid a number of individuals in the United States as claims adjusters, surveyors, and investigators and other representatives to enable it to conduct business" in the United States.[163]

Likewise, in *System Pipe & Supply, Inc. v. M/V VIKTOR KURNATOVSKIY*, the plaintiff alleged that the defendant: (1) made regular port calls in the United States; (2) established and advertised a shipping line that provided service from United States ports to the Mediterranean and Black Seas; (3) maintained a line of vessels that carry cargo from the eastern United States to Israel; (4) had a ship detained in Texas; (5) called at a Texas port and discharged cargo there; (6) had been involved in fifty actions in federal courts; and (7) had been a defendant in another suit in the district court where the plaintiff filed its action, and had not been dismissed from that suit for lack of

---

[161] 322 F.3d at 381.

[162] 364 F.3d at 651.

[163] *Id.*

28

personal jurisdiction.[164] The Fifth Circuit concluded that these allegations of extensive domestic

contacts, if established, "would be sufficient for the plaintiff to make a *prima facie* showing of

national minimum contacts" pursuant to Rule 4(k)(2).[165]

The foregoing Fifth Circuit cases precede two recent Supreme Court decisions, *Daimler AG*

*v. Bauman*[166] and *Goodyear Dunlop Tires Operations, S.A. v. Brown*,[167] and must therefore be read

in light of these decisions. In *Goodyear*, the Supreme Court held that general jurisdiction could not

be sustained based upon the defendant's "placement of . . . tires in the 'stream of commerce,'" such

that those tires "sporadically reached" the forum state through "intermediaries," because the

defendant was "in no sense at home" in the forum state by virtue of these "attenuated"

connections.[168]

In *Daimler*, the Court further developed the "at home" standard set forth in *Goodyear*,

holding that the maintenance of multiple facilities and extensive product sales in the forum by the

defendant's subsidiary, even if sufficient to render the subsidiary "at home" in the forum, and even

if imputed to the defendant, did not suffice to establish general jurisdiction.[169] In reaching this

conclusion, the Court reasoned that:

> [O]nly a limited set of affiliations with a forum will render a defendant amenable to
> all-purpose jurisdiction there . . . With respect to a corporation, the place of
> incorporation and principal place of business are paradigm bases for general

---

[164] 242 F.3d at 324–25.

[165] *Id.*

[166] 134 S.Ct. 746.

[167] 131 S.Ct. 2846, 2854–57 (2011).

[168] *Id.*

[169] 134 S.Ct. at 752–62.

jurisdiction. Those affiliations have the virtue of being unique—that is, each ordinarily indicates only one place—as well as easily ascertainable.[170]

Although the Court identified a defendant's place of incorporation and principal place of business as "paradigm bases" of general jurisdiction, it nonetheless declined to rule out "the possibility that in an exceptional case," such as *Perkins*, "a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in that State."[171]

On the facts before it, however, the Court found insufficient support for general jurisdiction, because neither the defendant nor its subsidiary were incorporated in the forum state or maintained their principal place of business there, and because "the same global reach" of general jurisdiction "would presumably be available in every other State in which [the defendant's] sales were sizeable" if the defendant's activities in the forum state were sufficient to establish general jurisdiction there.[172] In reaching this conclusion, the court added in a footnote that:

> The general jurisdiction inquiry does not focus solely on the magnitude of the defendant's in-state contacts. General jurisdiction instead calls for an appraisal of a corporation's activities in their entirety, nationwide and worldwide. A corporation that operates in many places can scarcely be deemed at home in all of them. Otherwise, "at home" would be synonymous with "doing business" tests framed before specific jurisdiction evolved in the United States.[173]

Considering the high threshold set in *Daimler*, the Fifth Circuit has recently indicated that it is "incredibly difficult to establish general jurisdiction" in a forum other than a corporation's place of

---

[170] *Id.* at 760 (internal citations, quotation marks, brackets, and ellipses omitted).

[171] *Id.* at 761 n.19 (citing *Perkins*, 342 U.S. at 447-48).

[172] *Id.* at 761.

[173] *Id.* at 762 n.20 (internal brackets, cross-references, and quotation marks omitted).

incorporation or principal place of business.[174]

### i. FMC Kongsberg

Taking Patterson's uncontroverted allegations as true, and resolving all factual conflicts in his favor, the Court will now consider whether FMC Kongsberg's alleged contacts establish a *prima facie* case in support of general jurisdiction over FMC Kongsberg. In support of general jurisdiction over FMC Kongsberg, Patterson indicates that FMC Kongsberg is "all but operating out of Houston,"[175] because: (1) FMC Kongsberg seconded 17 of its employees to FMCTI's Houston office between 2009 and 2012[176] and maintained its employment relationship with these seconded employees during their tenure in Houston;[177] (2) FMC Kongsberg's general counsel attended meetings with the "global legal team" in Houston;[178] (3) FMC Kongsberg and FMCTI had the same core business, subsea work;[179] (4) FMCTI "seconds" its employees to FMC Kongsberg;[180] and (5) secondment activity is ongoing.[181] FMC Kongsberg does not dispute that it "seconded" employees to Houston, but rather maintains that the employment structure set up by the secondment agreements, and the small share of its employees participating in these agreements, are insufficient

---

[174] *Monkton Ins. Servs., Ltd. v. Ritter,* 768 F.3d 429, 432 (5th Cir. 2014).

[175] Rec. Doc. 129 at p. 9.

[176] *Id.* at pp. 3-4 (citing Rec. Doc. 129-2; Rec. Doc. 129-3 (secondment agreements); Rec. Doc. 129-1 (chart summarizing secondments)).

[177] *Id.* at pp. 4–7 (citing Rec. Doc. 129-2; Rec. Doc. 129-3).

[178] *Id.* at pp. 7-8 (citing Rec. Doc. 129-4 at p. 4).

[179] *Id.* at p. 8 (citing Rec. Doc. 129-4 at p. 5).

[180] *Id.* (citing Rec. Doc. 129-5 at p. 5).

[181] *Id.* at pp. 8–9.

to establish a *prima facie* showing of general jurisdiction.[182]

In this inquiry, Patterson must make a *prima facie* showing that FMC Kongsberg is "essentially at home"[183] in the United States, as that term has been defined in *Goodyear* and *Daimler*. Thus, assuming, for purposes of argument, that FMC Kongsberg's contacts with the United States, when considered in *toto*, were continuous and systematic, and further assuming that FMC Kongsberg's seconded employees remained in the employ of FMC Kongsberg during their secondment periods, the Court will consider the "at home" requirement first.

On this point, *Daimler* limits the circumstances under which the requisite showing can be made to those cases where the defendant is incorporated in the forum, the defendant has its principal place of business in the forum, and other "exceptional cases" such as *Perkins*,[184] the "textbook case of general jurisdiction appropriately exercised over a corporation that has not consented to suit in the forum."[185] Additionally, *Daimler* requires the Court to consider a "corporation's activities in their entirety, nationwide and worldwide," because "[a] corporation that operates in many places can scarcely be deemed at home in all of them."[186]  In the present case, Patterson does not allege or argue that FMC Kongsberg is incorporated in the United States or has its principal place of business here. Therefore, neither of the two "paradigm bases" of general jurisdiction are at issue. Rather, Patterson

---

[182] Rec. Doc. 134 at pp. 3–6.

[183] *Goodyear*, 131 S.Ct. at 2851.

[184] 134 S.Ct. at 758 n. 11; 761 n. 19.

[185] *Id.* at 755–56.

[186] *Id.* at 762 n. 20.

argues that FMC Kongsberg "all but operat[ed] out of"[187] the United States by virtue of (1) its secondment activity, (2) its participation in meetings in the United States, and (3) its share of global subsea work.[188]

In *Daimler*, the Supreme Court pointed to *Perkins* as an example of an "exceptional case" in which general jurisdiction was appropriate in a forum "other than . . . [the defendant's] formal place of incorporation or principal place of business."[189] This Court, applying *Daimler* here, will likewise use *Perkins* as a benchmark, and will compare FMC Kongsberg's United States contacts with the contacts at issue in *Perkins*. In *Perkins*, the defendant's president, general manager, and principal stockholder maintained an office in the forum, supervised  many of the defendant's activities from the forum, kept the company's files there, held director's meetings there, and engaged in financial transactions there.[190]  Thus, the forum served as a *de facto* administrative hub for the defendant,[191] even though the defendant's core business operation, mining, occurred in the Phillippines.[192]

Here, although Patterson indicates that FMC Kongsberg employees attended meetings in the United States and worked out of FMCTI's office in the United States pursuant to an ongoing

---

[187] Rec. Doc. 129 at p. 9.

[188] Regarding the division of subsea work among FMC entities, Patterson points to statements made by Bille that the "FMC family" is divided into four regions which handle "more or less the same business" in different parts of the world. Rec. Doc. 129 at p. 8 (citing Rec. Doc. 129-4 at p. 5).

[189] 134 S.Ct. at 762 n. 19.

[190] 342 U.S. at 447-48.

[191] Indeed, in *Daimler*, the Court noted that the forum in *Perkins* was the defendant's "principal, if temporary, place of business." 134 S.Ct. at 756 (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 780 n. 11 (1984)).

[192] *See Perkins*, 342 U.S at 447–48.

secondment policy, he does not allege, and the record does not show, that FMC Kongsberg itself maintained an office in the United States, or kept any records in the United States, or administered its business from the United States. Thus, even when taking Patterson's uncontroverted allegations as true and resolving all factual conflicts in Patterson's favor, FMC Kongsberg's United States contacts, when considered in *toto*, do not suggest that the entity operated in a manner "comparable to a domestic enterprise" in the United States, at least to the extent that *Perkins* serves as the exemplar.[193]

Further, FMC Kongsberg's contacts with the United States are similar to contacts found insufficient to support general jurisdiction in pre-*Daimler* cases. Specifically, in *Central Freight Lines,* the Fifth Circuit rejected the assertion of general jurisdiction predicated upon the defendant's history of "routinely arrang[ing] and receiv[ing] interline shipments to and from Texas and apparently send[ing] sales people to the state on a regular basis to develop business, negotiate contracts, and service national accounts," because these contacts, even if deemed to be "continuous and systematic," were "clearly not substantial enough" to justify the exercise of general jurisdiction.[194]  Likewise, in *Johnston*,  the Fifth Circuit found that general jurisdiction could not be maintained notwithstanding a defendant's alleged employment of a resident of the forum, coordination of clinical trial work occurring in the forum, performance of work on behalf of forum companies, and sales and service of equipment in the forum.[195]

Here, as in *Central Freight Lines* and *Johnston*, Patterson alleges that FMC Kongsberg

---

[193] 134 S.Ct. at 758 n.11.

[194] 322 F.3d at 381. *See also Johntson*, 523 F.3d at 612–13.

[195] 523 F.3d at 613–15.

employees performed work in the forum and came to the forum for business activities. Although Patterson contends that FMC Kongsberg's practices are more "systematic" than the employment of forum residents at issue in other cases,[196] *Central Freight Lines* and *Johnston* instruct,[197] and *Daimler* confirms, that continuous and systematic contacts must be sufficiently substantial in order to support general jurisdiction.[198]

FMC Kongsberg's alleged activities in the United States are also less extensive and less comprehensive than the activities at issue in *Adams*, where the plaintiff made the requisite *prima facie* showing pursuant to Rule 4(k)(2). There, the record showed that the defendant essentially maintained a domestic business in the United States: it issued insurance policies to United States customers, paid those customers' claims, and maintained a workforce in the United States in furtherance of those activities.[199]  Likewise, the defendant in *System Pipe* allegedly maintained shipping lines dedicated to serving United States ports, regularly called at United States ports, and had been involved in extensive litigation in United States courts,[200] suggesting, as in *Adams*, a

---

[196] Patterson candidly and correctly represents that courts have rejected assertions of general jurisdiction premised upon the defendant maintaining employees in the forum. Rec. Doc. 129 at p. 8 (citing *Ratliff v. Cooper Laboratories, Inc.*, 444 F.2d 745 (4th Cir. 1971)).  He contends, however, that the present case is different, because FMC Kongsberg's secondment activity was continuous, systematic, and ongoing. Rec. Doc. 129 at pp. 8-9.

[197] *Central Freight Lines*, 322 F.3d at 381 ("Even if APA's contacts with the state of Texas have been, in some sense, 'continuous and systematic,' APA's activities, in toto, are clearly not substantial enough to justify subjecting APA to suit in the Western District of Texas based on a theory of general personal jurisdiction.").

[198] 134 S.Ct. at 761 ("the inquiry under *Goodyear* is not whether a foreign corporation's in-forum contacts can be said to be in some sense continuous and systematic, it is whether that corporation's affiliations with the State are so continuous and systematic as to render it essentially at home in the forum State.") (citations and internal quotation marks omitted).

[199] 364 F.3d at 651.

[200] *Id.*

35

substantial domestic business presence surpassing the limited presence at issue here.[201]

Regardless, to the extent that FMC Kongsberg's United States contacts are evaluated pursuant to the foregoing Fifth Circuit decisions, all of which pre-date *Daimler*, this Court gives *Daimler* the last word.  Pursuant to *Daimler*, this Court must consider a "corporation's activities in their entirety, nationwide and worldwide," because "[a] corporation that operates in many places can scarcely be deemed at home in all of them."[202]  Although *Daimler* provides little express guidance on this point, the subsidiary entity in that case maintained facilities in the forum, and sales of the defendant's products in the forum amounted to 2.4% of its global total, but these contacts still fell short of the mark.[203]  Here, although Patterson indicates that FMC Kongsberg employees attended meetings and performed work in the United States, FMC Kongsberg, indicates that it employs 4,600 people,[204] a figure that Patterson, who bears the burden on this motion, does not dispute. The 17 employees allegedly seconded to the United States between 2009 and 2012[205] amount to less than 1% of that workforce. Finally, although Patterson indicates that FMC Kongsberg geographically divides

---

[201] In support of general jurisdiction in the present case, Patterson cites *Hunter v. Serv-Tech, Inc.*, No. 07-9009, 2009 WL 2447999 at *5 (E.D. La. Aug. 6, 2009) (Englehardt, J.), in which the district court noted that "[w]hen determining the sufficiency of minimum contacts for general jurisdiction under Rule 4(k)(2), courts consider whether the nonresident defendant: (1) transacts business in the United States; (2) performs an act in the United States; or (3) performs an act elsewhere which has an effect in the United States."  In so stating, the district court relied upon *Stutzman v. Rainbow Yacht Adventures, Ltd.*, No. 06-300, 2007 WL 415355 at *3 (N.D. Tex. Feb. 7, 2007). The district court in *Stutzman* in turn relied upon *Saudi v. S/T Marine Atlantic*, 159 F.Supp.2d 469, 480 (S.D. Tex. 2000) and *Norvel v. Ulstein Propeller AS*, 161 F.Supp.2d 190, 206 (S.D.N.Y. 2001), both of which decisions rely upon authority from outside the Fifth Circuit. Applying this authority, the district court in *Hunter* found that Rule 4(k)(2) jurisdiction could be sustained on the basis that eleven of the defendant's employees performed work for a Texas-based company in the United States. In addressing the issues presented here, this Court finds it unnecessary to look beyond controlling United States Supreme Court and Fifth Circuit authority.

[202] 134 S.Ct. at 762 n. 20.

[203] *Id.* at 752.

[204] Rec. Doc. 134 at p. 4.

[205] Rec. Doc. 129 at p. 1.

subsea work with FMCTI and other affiliated entities,[206] this geographical division does not suggest any United States presence not already encompassed by the secondment agreements and by FMC Kongsberg employees' participation in meetings in the United States.

Thus, even when taking Patterson's uncontroverted allegations as true and resolving all factual conflicts in Patterson's favor, FMC Kongsberg's contacts, considered *in toto*, do not rise to the substantial level required in order to establish a *prima facie* case that FMC Kongsberg was essentially at home in the United States. Lacking the requisite *prima facie* showing on this point, the Court concludes that Patterson has failed to establish an essential element of his case for general jurisdiction over FMC Kongsberg. Thus, FMC Kongsberg's motion will be granted.

### ii.    Aker Subsea

Patterson also contends that he has made the requisite *prima facie* showing of general jurisdiction over Aker Subsea, because he has submitted copies of secondment agreements confirming that Aker Subsea "had a continuous and systematic process" of sending employees to work in the United States.[207] Aker Subsea, however, argues that "there is no legal basis or precedent for exercising general jurisdiction" arising from these secondment agreements.[208]

On this point, Patterson's arguments are unavailing, for reasons essentially identical to those applicable to FMC Kongsberg. Patterson indicates that Aker Subsea, like FMC Kongsberg, sent employees to the United States pursuant to secondment agreements. However, even when taking Patterson's uncontroverted allegations on this point as true, and even when resolving all factual

---

[206] *Id.* at p. 8.

[207] Rec. Doc. 139 at pp. 1–2 (citing Rec. Doc. 139-1; Rec. Doc. 139-2; Rec. Doc. 139-3).

[208] Rec. Doc. 125 at p. 3.

disputes in Patterson's favor, these contacts, when considered in *toto*, do not meet the "incredibly"[209] demanding threshold set by the Supreme Court's *Daimler* and *Goodyear* decisions and by Fifth Circuit authority on point.

Specifically, Patterson does not allege or adduce evidence indicating that Aker Subsea is incorporated in the United States or has its principal place of business here; thus, neither of *Daimler*'s two paradigmatic bases for general jurisdiction are at issue. Further, Aker Subsea's use of secondment agreements, even if assumed to be continuous and systematic, does not approach the substantial business presence found sufficient to support general jurisdiction in *Perkins*. Patterson does not allege or point to evidence indicating that Aker Subsea maintained an office or kept records in the United States or administered its business from here. Therefore, using *Perkins* as an exemplar, as *Daimler* did, and considering Aker Subsea's United States contacts *in toto*, Aker Subsea's United States presence is not so substantial that the entity can fairly be regarded as being "at home" here.

Indeed, Aker Subsea's United States contacts, like FMC Kongsberg's United States contacts, are less substantial than the contacts at issue in the Fifth Circuit's *Adams* and *System Pipe* cases. In *Adams*, the defendant served numerous United States customers and employed a workforce in the United States in furtherance of that business.[210] In *System Pipe*, the defendant operated shipping lines dedicated to serving United States ports, regularly called at United States ports, and had been extensively involved in litigation in the United States.[211] Here, although Patterson indicates that Aker Subsea sent employees to work in the United States, he has not alleged that Aker Subsea itself had

---

[209] *Monkton,* 768 F.3d at 432.

[210] 364 F.3d at 651.

[211] *Id.*

a business presence in the United States, let alone a substantial presence, as in *Adams* and *System Pipe*. Further, and as is the case with FMC Kongsberg, Aker Subsea's domestic contacts are more closely analogous to the contacts at issue in *Johnston* and *Central Freight Lines*,[212] in which the Fifth Circuit found the defendants' forum contacts insufficiently substantial to warrant the exercise of general jurisdiction.

In support of his assertion of general jurisdiction over Aker Subsea, Patterson cites *Johnson v. PPI Technology Services, L.P.*, a case in which a district court in the Eastern District of Louisiana concluded that it could exercise general jurisdiction over a defendant pursuant to Rule 4(k)(2), on the basis that the defendant managed payroll for 300 United States citizens from an office in Houston, reasoning that the defendant "cannot effectively run its payroll operations out of Houston, hold itself out to the recipients of its paychecks as having an office in Houston, and only employ United States citizens who work abroad, while at the same time avoiding being brought into court in the United States."[213] Here, by contrast, Patterson has not alleged or adduced evidence showing that Aker Subsea maintains a comparably substantial business presence in the United States.

Thus, even when taking Patterson's allegations as true and resolving all factual conflicts in Patterson's favor, Aker Subsea's United States contacts, considered *in toto*, do not rise to the substantial level required in order to establish a *prima facie* case that Aker Subsea was essentially at home in the United States. Absent the requisite *prima facie* showing on this point, Patterson has not established an essential element of his case for general jurisdiction over Aker Subsea.

---

[212] *Central Freight Lines*, 322 F.3d at 381; *Johnston*, 523 F.3d at 613–615.

[213] 926 F.Supp.2d 873, 885 (E.D. La. 2013) (Barbier, J.).

### b.        Specific Jurisdiction

As noted above, Patterson has expressly conceded that he cannot make the requisite *prima facie* showing of specific jurisdiction over FMC Kongsberg.[214] He has not, however, made such a concession as to Aker Subsea. Accordingly, the Court will consider whether it may exercise specific jurisdiction over Aker Subsea.

"Specific jurisdiction focuses on the relationship among the defendant, the forum, and the litigation."[215] This Court may exercise specific jurisdiction over a nonresident corporation when the corporation [1] "has purposefully directed its activities" at the forum and [2] "the litigation results from alleged injuries that arise out of or relate to those activities."[216] If a plaintiff makes a *prima facie* showing on these two points, then "the burden shifts to [the defendant] to show that exercising jurisdiction would be unfair or unreasonable."[217]

Here, even assuming that Aker Subsea has purposefully directed its activities at the United States, it would still be necessary to consider whether Patterson's claims against it result from injuries arising from, or related to, Aker Subsea's activities in the United States. In opposition to the instant motion, Patterson indicates that Aker Subsea participated in secondment agreements through which its employees worked in the United States.[218] However, Patterson does not allege, nor point to any evidence indicating, that his injuries arose from, or relate to, Aker Subsea's secondment activities. Further, Patterson cites no authority indicating that a defendant's placement of employees

---

[214] *See* Rec. Doc. 129 at p. 3 n.3.

[215] *Monkton*, 768 F.3d 429 (quoting *Walden v. Fiore*, 134 S.Ct. 1115, 1121 (2014)).

[216] *Quick Technologies,* 313 F.3d at 344.

[217] *Monkton*, 768 F.3d at 433 (citations omitted).

[218] Rec. Doc. 139 at pp. 1–2.

in the forum can support the exercise of specific jurisdiction if not related to the events in dispute. Thus, even when taking Patterson's uncontroverted factual allegations as true, and resolving all factual conflicts in Patterson's favor, the Court finds that Patterson has not established an essential element of his *prima facie* case of specific jurisdiction over Aker Subsea.

### 2.     Jurisdictional Discovery

In opposition to Aker Subsea's motion, Patterson initially represented that he required time to conduct jurisdictional discovery in order to determine whether Aker Subsea "does any business, or has any contacts, with the United States as a whole," and whether Aker Subsea seconded employees to the United States.[219] Subsequently, Patterson moved to continue submission of the instant motion to allow for 90 days of jurisdictional discovery.[220] On October 3, 2014, the Court granted the motion, continuing the submission of Aker Subsea's motion until January 7, 2015.[221] On December 30, 2014, Patterson averred that he required more time to complete jurisdictional discovery, because he obtained certain documents and deposed Funnemark in December 2014, had not yet obtained the secondment agreements referenced by Funnemark in his deposition, and had not deposed individuals identified by Funnemark in that deposition.[222] He further requested that he be given the opportunity to pursue additional jurisdictional discovery in the event that the Court finds that he has not made the requisite *prima facie* showing of personal jurisdiction.[223] Finally, on March 11, 2015, Patterson filed a supplemental opposition to the instant motion, in which he avers,

---

[219] Rec. Doc. 99.

[220] Rec. Doc. 100.

[221] Rec. Doc. 101.

[222] Rec. Doc. 122 at p. 4.

[223] *Id.*

without noting any need for further discovery, that he has made the requisite *prima facie* showing of personal jurisdiction,[224] suggesting that his earlier requests for jurisdictional discovery are now moot.

To the extent that Patterson's earlier requests for jurisdictional discovery are not now moot, the Court notes that it has "broad discretion in all discovery matters."[225] If a plaintiff's factual allegations "suggest with reasonable particularity the possible existence of the requisite contacts," then "the plaintiff's right to conduct jurisdictional discovery should be sustained."[226] If, on the other hand, the requested discovery "could not . . . [add] any significant facts," requests for jurisdictional discovery are properly denied.[227]

Here, the Court granted Patterson's request for additional time to conduct jurisdictional discovery. Apart from seeking discovery into Aker Subsea's secondment agreements, Patterson initially requested additional time to conduct discovery regarding whether Aker Subsea does any business in the United States or has any contacts with the United States. After being granted an opportunity to conduct discovery on this broad point, Patterson has pointed only to Aker Subsea's secondment agreements in support of his jurisdictional arguments. Further, Patterson's complaint does not indicate that Aker Subsea has other United States contacts. There, Patterson alleges that Aker Subsea "contracted to provide technical supervision at the time of [his] accident," and failed to provide that supervision.[228] Patterson does not allege, however, that any of these activities might

---

[224] Rec. Doc. 139 at p. 2.

[225] *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 270 (5th Cir. 2006).

[226] *Fielding v. Hubert Burda Media, Inc.*, 415 F.3d 419, 429 (5th Cir. 2005).

[227] *Alpine View Co. Ltd. v. Atlas Copco AB*, 205 F.3d 208, 221 (5th Cir. 2000) (citations omitted).

[228] Rec. Doc. 73 at p. 2.

be connected to the United States.

In support of his request for further jurisdictional discovery, Patterson cites *Lotherington v. Sedgwick Group PLC*,[229] in which a district court denied as premature a motion for summary judgment based upon a lack of personal jurisdiction. There, the district court concluded that the record contained insufficient evidence regarding whether the defendant was an *alter ego* of its subsidiaries, such that those subsidiaries' forum contacts could be imputed to it.[230] Here, by contrast, Patterson asserts that secondment agreements support the exercise of general jurisdiction. Having considered, and rejected, Patterson's arguments on this point, it appears that further jurisdictional discovery could not add any significant facts. Thus, to the extent that Patterson's request for further jurisdictional discovery is not moot, it will be denied.

## IV. Conclusion

For the foregoing reasons,

**IT IS ORDERED** that Defendant FMC Kongsberg's "Re-Urged Motion to Dismiss for Lack of Personal Jurisdiction Pursuant to Rule 12(b)(2)"[231] is **GRANTED.**

---

[229] No. 96-2316, 1996 WL 655797 (E.D. La. Nov. 7, 1996) (McNamara, J.).

[230] *Id.* at *2.

[231] Rec. Doc. 127.

43

**IT IS FURTHER ORDERED** that Aker Subsea's "Motion to Dismiss"[232] is

**GRANTED.**

**NEW ORLEANS, LOUISIANA,** this <u>6th</u> day of July, 2015.

**NANNETTE JOLIVETTE BROWN**
**UNITED STATES DISTRICT JUDGE**

---

[232] Rec. Doc. 97.